Binh PHAN, Son Thai Huynh, Dennis Vladimirovich Batyuchenko, Khamsaene Sivongxay, Kim Ho Ma, Petitioners,

v.

Janet RENO; United States Immigration and Naturalization Service; and Richard C. Smith, Respondents.

Nos. C98–234Z, C99–177C, C99–185R, C99–341WD and C99–151L.

United States District Court,
W.D. Washington,
at Seattle.

July 9, 1999.

Thomas H. Hillier, Federal Public Defender, Jay Warren Stansell, Asst. Federal Public Defender, Jennifer E. Wellman, Staff Atty., Public Defenders Office, Seattle, WV, Susan L Barnes, McKay Chadwell, PLLC, Seattle, Jayashri Srikantiah, American Civil Liberties Union Foundation, Immigrants' Rights Project, San Francisco, CA, for Binh Phan, petitioners.

David B Hopkins, Office of the District Counsel, U.S. Immigration and Natz SVC, Christopher Lee Pickrell, U S Attorney's Office, Seattle, Quynh Vu, U.S. Department of Justice, Office of Immigration Litigation, Washington, DC, for Richard Smith, INS Director, respondents.

Before JOHN C. COUGHENOUR, Chief Judge, and BARBARA JACOBS ROTHSTEIN, WILLIAM L. DWYER, THOMAS S. ZILLY, and ROBERT S. LASNIK, District Judges.

## JOINT ORDER

COUGHENOUR, Chief Judge.

### INTRODUCTION

More than one hundred habeas corpus petitions are currently pending in the Western District of Washington wherein aliens ordered deported to countries that have refused them admittance challenge the legality of their continued detention by the Immigration and Naturalization Service (INS). In an order dated April 22, 1999, the undersigned judges of the Western District designated five lead cases[1] that present issues common to all petitioners and directed the parties to brief and argue these common issues together; the remaining cases were stayed pending decisions in the lead cases.[2] The issues common to all petitioners have been thoroughly briefed by the parties, as well as by the American Civil Liberties Union and Northwest Immigrants Rights Project as amici curiae. Sitting en banc, we heard oral argument on the common issues on June 17, 1999.

Due to the great number of cases currently pending in this district that raise the same issue, namely whether INS detention of aliens ordered deported to countries that have refused them admittance violates substantive or procedural due process, we recognize the need to adopt a consistent legal framework to guide our individual consideration of these petitions. To that end, after carefully considering the written and oral arguments offered by all parties and amici, we have reached agreement on the analysis set out in this joint order. In the individual orders that follow, we evaluate the merits of each lead case in light of the framework established in this joint order.

## I. General Background

The five lead petitioners and the aliens whom they represent are lawful permanent residents of the United States who have been ordered deported to their native countries because they committed crimes designated by Congress as deportable offenses. The petitioners have been detained at various state and federal facilities by the INS since their orders of deportation became final. The INS has been unable to deport the petitioners, despite the final orders of deportation, because their countries of origin refuse to receive them. They nevertheless continue to be detained. As of the date of this order, the five lead petitioners have been detained between eight months and three years. All petitioners challenge the constitutionality of their continued detention on substantive and procedural due process grounds.

In this order, we consider our jurisdiction to entertain the pending habeas petitions and the government's exhaustion argument. Concluding that jurisdiction exists and that no exhaustion requirement bars reaching the merits, we turn to petitioners' constitutional claims, addressing the substantive due process claim first and then evaluating the constitutionality of the current INS detention procedures.

## II. Statutory and Regulatory Framework

Prior to 1996, after a final order of deportation had been entered, aliens generally could not be detained pending deportation for more than six months. Former INA § 242(c), 8 U.S.C. § 1252(c) (1994). Upon expiration of the six-month period, such aliens had to be released, but they remained subject to the supervision

1. The five lead cases are *Phan v. Smith,* 56 F.Supp.2d 1158 (W.D.Wash. 1999); *Huynh v. INS,* 56 F.Supp.2d 1160 (W.D.Wash. 1999); *Batyuchenko v. INS,* C99–185R, —— F.Supp.2d —— (W.D.Wash. 1999); *Sivongxay v. INS,* 56 F.Supp.2d 1167 (W.D.Wash. 1999);

and *Ma v. INS,* 10 56 F.Supp.2d 1165 (W.D.Wash. 1999).

2. All cases filed after April 22nd that raise the same issues were similarly stayed pursuant to a supplemental order dated June 29, 1999.

of the Attorney General. Former INA § 242(d), 8 U.S.C. § 1252(d) (1994).

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, 110 Stat. 1214 (enacted on April 24, 1996), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. 104–208, 110 Stat. 3009–546 (enacted on September 30, 1996), both of which substantially revised the detention provisions of the INA. AEDPA § 440(c) amended § 1252(a)(2) to require the Attorney General to take into custody aliens convicted of aggravated felonies, controlled substance offenses, firearms offenses, and other serious crimes upon the release of such aliens from incarceration. 110 Stat. 1277, *amended by,* IIRIRA § 306(d), 110 Stat. 3009–612. AEDPA § 440(c) required the Attorney General to detain such aliens pending their removal from the United States.

Five months later, IIRIRA restored some release discretion to the Attorney General. The current procedural framework provides for mandatory detention of criminal aliens during removal proceedings, INA § 236(c), 8 U.S.C. § 1226(c) (1999), and for 90 days thereafter, during which time removal should generally occur, INA § 241(a)(2), 8 U.S.C. § 1231(a)(2) (1999).[3] If removal cannot be accomplished during this period, the Attorney General retains discretion to continue to detain criminal aliens she determines "to be a risk to the community or unlikely to comply with the order of removal." INA § 241(a)(2), 8 U.S.C. § 1231(a)(6) (1999).

The implementing regulations delegate the Attorney General's discretionary release power to the INS District Director. 8 C.F.R. § 241.4; 8 C.F.R. § 236.1(d)(2)(ii). Under the regulations, to obtain release the alien must demonstrate "by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk." *Id.* In such circumstances, the District Director may in the exercise of his discretion either release the alien, or continue to maintain the alien in custody. *Id.* The regulation also lists nine non-exclusive factors that the District Director may consider in making such determinations.[4] The alien may appeal an adverse decision to the Board of Immigration Appeals. 8 C.F.R. § 236.1(d)(3)(ii).

The INS has recently implemented further policies related to "detention procedures for aliens whose immediate repatriation is not possible or practicable." *See* Pearson Memo, INS Ex. A (emphasis omitted). The guidelines found in the Pearson Memo provide for automatic review of post-final order detention cases before and after the expiration of the 90–day removal period. Additionally, the guidelines provide for mandatory review every six months thereafter to enable the District Director to "determine whether there has been a change in circumstances that would support a release decision" *Id.* The director can delegate the file review process-but not the decision-making function-to assistants. *Id.* Aliens have no right to appeal a release denial made pursuant to the Pearson Memo. *Id.*

### III.  Jurisdiction

As all parties concede, the general habeas corpus statute, 28 U.S.C. § 2241, provides the Court the authority to grant a

---

**3.** These mandatory detention provisions apply to aliens who are deportable because they were convicted of a crime involving moral turpitude, an aggravated felony, certain firearms offenses, and other miscellaneous crimes. INA § 241(a)(2); 8 U.S.C. § 1231(a)(2) (1999).

**4.** These factors are "(1) The nature and seriousness of the alien's criminal convictions; (2) Other criminal history; (3) Sentence(s) imposed and time actually served; (4) History of failures to appear for court (defaults); (5) Probation history; (6) Disciplinary problems while incarcerated; (7) Evidence of rehabilitative effort or recidivism; (8) Equities in the United States; and (9) Prior immigration violations and history." 8 C.F.R. § 241.4(a)(1)-(9).

writ of habeas corpus to a person held "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2241(c)(3), and has historically afforded the jurisdictional basis for courts to review the constitutionality of executive detention. Petitioners' claims here fall squarely within § 2241. Therefore, this Court has jurisdiction to consider the constitutionality of their detention. *See Mayers v. INS*, 175 F.3d 1289, 1999 WL 317121 (11th Cir. May 20, 1999); *Sandoval v. Reno*, 166 F.3d 225 (3d Cir.1999); *Henderson v. INS*, 157 F.3d 106, 118–22 (2d Cir.1998), *cert. denied*, 119 S.Ct. 1141, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999); *Goncalves v. Reno*, 144 F.3d 110 (1st Cir. 1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999).

## IV. Exhaustion of Administrative Remedies

■ As a threshold matter, the government argues that the Court should decline to exercise its jurisdiction because petitioners have failed to exhaust their administrative remedies. More specifically, the government urges us to require petitioners to appeal the denial of their formal release requests before reaching the merits of their constitutional claims, suggesting that if petitioners' detention claims can be resolved through the administrative process, they should be.

While the INA contains no statutory provision requiring exhaustion, the Court may apply the doctrine if "sound judicial discretion" so advises. *McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). It is true that the general policies underlying the exhaustion doctrine-to avoid premature interruption of the administrative process and to allow executive agencies to exercise their discretionary authority-would counsel in favor of an exhaustion requirement were the Court

being asked to review discretionary determinations by the INS or other administrative findings of fact. *See, e.g., Lleo–Fernandez v. INS*, 989 F.Supp. 518, 519 (S.D.N.Y.1998). But this is not what petitioners ask us to do. Rather, they ask us to decide whether their continued detention is lawful under applicable statutes and the Fifth Amendment. No administrative proceeding exists to consider these issues. Under the circumstances, no exhaustion requirement should be imposed. *McCarthy*, 503 U.S. at 144, 112 S.Ct. 1081; *see also Tam v. INS*, 14 F.Supp.2d 1184, 1189 (E.D.Cal.1998).

Concluding that we have jurisdiction and petitioners need not exhaust administrative remedies, we now turn to petitioners' constitutional claims.

## V. Due Process Claims

■ The Due Process Clause of the Fifth Amendment to the United States Constitution protects the most basic and fundamental of human rights, ensuring that no person will be deprived of life, liberty or property without due process of the law. U.S. Const. Amend. V. Its protection extends to all "persons" within the borders of the United States, including deportable aliens. *Landon v. Plasencia*, 459 U.S. 21, 32–33, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). There is, however, one narrow exception to this rule. Based on what has become known as the "entry fiction," [5] a number of cases have held that aliens who are placed in exclusion proceedings before entering the United States are legally considered to be detained at the border and are thus not entitled to due process protection. *Id.; Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Barrera–Echavarria v. Rison*, 44 F.3d 1441, 1450 (9th Cir.1995) (en banc). As a result,

---

5. "*Mezei* established what is known as the 'entry fiction' which provides that although aliens seeking admission into the United States may physically be allowed within its border pending a determination of admissibil-ity, such aliens are legally considered to be detained at the border and hence as never having effected entry into the country." *Barrera–Echavarria v. Rison*, 44 F.3d 1441, 1450 (9th Cir.1995) (en banc) (citations omitted).

the Due Process Clause affords an excludable alien no procedural protection beyond the procedure explicitly authorized by Congress, *see Mezei*, 345 U.S. at 212, 73 S.Ct. 625, nor any "substantive right to be free from immigration detention." *Barrera*, 44 F.3d at 1450.

The entry fiction doctrine is inapplicable here. Petitioners are deportable-not excludable-aliens, and this distinction is critical. An excludable alien seeking admission "requests a privilege and has no constitutional rights regarding his application." *Plasencia*, 459 U.S. at 32, 103 S.Ct. 321. But "[o]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly." *Id.* Petitioners fall into the latter category. No authority supports the government's position that aliens somehow "assimilate" to excludable status once they have been ordered deported, thereby relinquishing their constitutional rights.[6] Petitioners are all long-time permanent legal residents of the United States and, as such, are "persons" entitled to the protection of the Fifth Amendment, despite having been ordered deported.

Turning to the merits, petitioners challenge their detention on both substantive and procedural due process grounds. We address first petitioners' substantive due process claim: only if a restriction on liberty survives substantive due process scrutiny is it necessary to consider whether the restriction is implemented in a procedurally fair manner. *See United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

### A. Substantive Due Process

Above and beyond the procedural guarantee explicit in the Due Process Clause itself, federal courts have long recognized a limited "substantive" component that "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). The Supreme Court has counseled restraint in recognizing a particular interest as deserving of substantive due process protection, *see Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), and the analysis should begin "with a careful description of the asserted right." *Flores*, 507 U.S. at 302, 113 S.Ct. 1439.

The government argues that the interest at issue is petitioners' "right to be released into the United States pending [their] removal." But this definition construes petitioners' right too narrowly. The issue here is much more basic—it is simply the right to be at liberty. Put another way, at issue is petitioners' fundamental liberty interest in being free from incarceration. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). Petitioners' liberty interest is fundamental and deserving of due process protection.

As a general rule, government invasions of fundamental liberty interests are subject to strict scrutiny review: a deprivation will comport with due process only if it is narrowly tailored to serve a

---

**6.** The Supreme Court has held that a lawful permanent resident who leaves the United States then later seeks reentry may, upon his reentry, "assimilate" to the status of a continuously residing lawful permanent resident for purposes of his constitutional right to due process. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (permanent resident alien returning from five-month voyage abroad on Merchant Marine

ship not subject to regulations permitting exclusion of arriving aliens without a hearing). The assimilation doctrine thus has been used to provide extra protection for resident aliens who have left the United States and who later seek reentry. No court in a published opinion, however, has ever used the assimilation doctrine to reduce the constitutional protection afforded lawful resident aliens who have never physically left the United States.

compelling government interest. *Flores,* 507 U.S. at 301–02, 113 S.Ct. 1439. Applying this standard of review in detention cases, courts consider whether the detention is "imposed for the purpose of punishment or whether it is merely incidental to another legitimate governmental interest." *Tam v. INS,* 14 F.Supp.2d at 1191(quoting *Gisbert v. U.S. Attorney General,* 988 F.2d 1437, 1441 (5th Cir.1993)); *Bell v. Wolfish,* 441 U.S. 520, 536–40, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).[7] This requires the Court to consider the constitutionality of the detention in light of its purpose, and to ask whether the detention is based upon "permissible" regulatory goals of the government and, if it is, whether the detention is excessive in relation to those goals. *Martinez v. Greene,* 28 F.Supp.2d 1275, 1282 (D.Colo.1998) (citing *Salerno,* 481 U.S. at 747, 107 S.Ct. 2095); *Tam,* 14 F.Supp.2d at 1191 (quoting *Gisbert,* 988 F.2d at 1441); *Zadvydas v. Caplinger,* 986 F.Supp. 1011, 1025–26 (E.D.La.1997).

■ Even so, argues the government, when reviewing immigration matters, the Court's power to inquire into alleged violations of petitioners' substantive due process rights is limited, and the Court should therefore apply a more deferential standard of review. The INS correctly states that the legislative and executive branches possess "plenary power" over immigration and naturalization, *Flores,* 507 U.S. at 305–06, 113 S.Ct. 1439, and that judicial deference to the political branches on these matters allows for greater flexibility to adjust policy choices to changing political and economic circumstances. *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). Moreover, judicial deference allows the political branches to " 'exercise especially sensitive political functions that implicate questions of foreign relations,' " *INS v. Aguirre–Aguirre,* — U.S. —, —, 119 S.Ct. 1439, 1445, 143 L.Ed.2d 590 (1999) (quoting *INS v.*

*Abudu,* 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)), and recognizes that "[i]n the exercise of its broad power over nationalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews,* 426 U.S. at 79–80, 96 S.Ct. 1883.

While the plenary power doctrine supports judicial deference to the legislative and executive branches on substantive immigration matters, such deference does not extend to post-deportation order detention. Indefinite detention of aliens ordered deported is not a matter of immigration policy; it is only a *means* by which the government implements Congress's directives. The dangers at which the detention scheme is directed, chiefly the prevention of flight and the protection of the community pending deportation of aliens who have been convicted of crimes, involve domestic interests rather than international concerns. Whether petitioners are detained or released on bond until the government can facilitate their deportation does not raise foreign relations questions. Accordingly, the plenary power doctrine has far less force here than it does, for example, over decisions concerning who should or should not be admitted, or who should or should not be deported. Finally, detention threatens the deprivation of a fundamental liberty interest and thus clearly triggers "heightened, substantive due process scrutiny," not judicial deference. *Flores,* 507 U.S. at 316, 113 S.Ct. 1439 (O'Gonnor, J., concurring). For these reasons, the Court finds that the plenary power doctrine does not support a deferential standard of review of petitioners' detention. Heightened scrutiny applies.

The government advances three regulatory interests, all of which satisfy the "permissible" standard: (1) ensuring the removal of aliens ordered deported; (2) preventing flight prior to deportation; and

---

7. The Ninth Circuit has held that immigration detention is not punishment. *Alvarez–Mendez v. Stock,* 941 F.2d 956, 962 (9th Cir.1991).

(3) protecting the public from dangerous felons. *See* 8 U.S.C. § 1231(a)(6). Clearly the government has a legitimate interest in securing the safe removal of aliens. Indeed, this is a primary objective of the INS: to decide which aliens may remain in the United States and which must leave, and to facilitate the safe and expeditious removal of aliens ordered deported. The latter two goals are incidental to this primary objective. Citing recent widespread recidivism and abscondence among criminal aliens, the INS contends it must retain the discretion to detain individuals such as the petitioners so that it can facilitate their safe removal. These also are "permissible" goals, but ones that derive solely from the power to deport.

The critical inquiry, therefore, is whether an alien's detention is *excessive* in relation to these government interests. In making this determination, we must necessarily balance the likelihood that the government will be able to effectuate deportation, against the dangerousness of a petitioner and the likelihood that he will abscond if released. In so doing, it becomes clear that as the probability that the government can actually deport an alien decreases, the government's interest in detaining that alien becomes less compelling and the invasion into the alien's liberty more severe. Dangerousness and flight risk are thus permissible considerations and may, in certain situations, warrant continued detention, but only if there is a realistic chance that an alien will be deported. Detention by the INS can be lawful only in aid of deportation. Thus, it is "excessive" to detain an alien indefinitely if deportation will never occur.

The foregoing provides the appropriate legal framework under which petitioners' substantive due process claims must be individually evaluated. For the lead petitioners, we perform this evaluation in their respective cases in the orders following this joint order. The remaining petitions shall be evaluated pursuant to the procedure set forth in the Conclusion, *infra.*

## B. Procedural Due Process

The substantive due process analysis necessarily turns on the individual facts and circumstances presented by each petitioner. If, upon evaluating a petitioner's detention in light of the above substantive due process framework, it is concluded that there exists no constitutional deprivation, the Court would normally then consider whether the procedures pursuant to which the petitioner is being detained pass constitutional muster. *See Salerno,* 481 U.S. at 746, 107 S.Ct. 2095. Unlike substantive due process, however, the procedures governing petitioners' detention are uniform; that is, the same procedural scheme applies to all. For this reason, we shall consider petitioners' procedural due process claims collectively in this joint order.

■ This analysis begins with the Due Process Clause of the Fifth Amendment, which entitles petitioners to procedural due process of law in their deportation proceedings. "The constitutional sufficiency of the procedures provided in any situation, of course, varies with the circumstances." *Plasencia,* 459 U.S. at 34, 103 S.Ct. 321 (citing *Lassiter v. Department of Soc. Serv.,* 452 U.S. 18, 24–25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). To determine what process is constitutionally mandated, the Court must review the existing procedural framework, then consider "the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures." *Plasencia,* 459 U.S. at 34, 103 S.Ct. 321 (citing *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).[8]

---

**8.** In its supplemental response, the government contends that the *Mathews* test is inapplicable, and that petitioners' procedural due process claims should be judged instead

As stated above, the interest at stake is petitioners' freedom; as a fundamental right, this interest is clearly substantial. The government's interest in effectuating the safe removal of aliens ordered deported is also substantial, but as discussed above, this interest becomes less compelling as the probability of deportation decreases. The outcome thus hinges on the second part of the *Mathews* test: the risk of erroneous deprivation and the value of additional procedures.

The government defends the existing procedural framework as complying with due process. It points out that release decisions are based upon either the District Director's review of the alien's written submissions and administrative file or an interview with the alien and that the Director considers each of the nine factors set forth at 8 C.F.R. § 241.4 in making those decisions. This, the government submits, is more than sufficient process to ensure that only a minimal risk of erroneous deprivation of petitioners' liberty interest exists.

In response, petitioners and amici curiae assert that the procedural scheme as it now exists is structurally biased against meaningful review of petitioners' individual circumstances and therefore violates their procedural due process rights. "Due to political and community pressure, the INS, an executive agency, has every incentive to continue to detain aliens with aggravated felony convictions, even though they have served their sentences, on the suspicion that they may continue to pose a danger to the community." *St. John v. McElroy*, 917 F.Supp. 243, 251 (S.D.N.Y.1996). This

bias, petitioners urge, precludes an impartial review of their release requests, thereby denying them procedural due process.

Other courts faced with similar situations have expressed "little confidence" in release determinations by District Directors. *Cruz–Taveras v. McElroy*, 1996 WL 455012 (S.D.N.Y. Aug.13, 1996); *Thomas v. McElroy*, 1996 WL 487953 (S.D.N.Y. Aug.27, 1996); *Alba v. McElroy*, 1996 WL 695811 (S.D.N.Y. Dec.4, 1996).[9] These courts found that instead of individually assessing dangerousness and flight risk, Directors simply relied on the aliens' past criminal history and the fact that they were facing removal from the United States, summarily concluding that the aliens posed such risks and denying them release. This does not meet the requirements of procedural due process.

We have similar concerns about the quality of the review afforded by the INS to the petitioners. Indeed, our review of the record confirms that the INS does not meaningfully and impartially review the petitioners' custody status. The absence of any individualized assessment or consideration of the petitioners' situations in light of the pertinent factors set forth in the regulations violates their procedural due process rights. At a minimum, each petitioner is entitled to a fair and impartial hearing before an immigration judge at which he or she can present evidence to support release pending deportation. The immigration judge must actually consider the factors set forth at 8 C.F.R. § 241.4 and explain how they apply to each petitioner's unique circumstances. Petitioners also must be able to appeal any adverse denial of a release request to the BIA. The

under the *Flores* "(unexacting) standard of rationally advancing some legitimate governmental purpose." *See* INS Br. at 22. *Plasencia* governs, and dictates the applicability of the *Mathews* test. *Plasencia*, 459 U.S. at 34, 103 S.Ct. 321. The *Flores* Court found petitioners' procedural due process claims to be a restatement of the substantive due process claims, and rejected them on that basis without setting forth a new standard of review. *Flores*, 507 U.S. at 306–07, 113 S.Ct. 1439.

9. These cases concern parole hearings for lawful permanent residents who left the United States temporarily and upon their return were placed in exclusion hearings. The statutory scheme at issue there required mandatory detention of aliens convicted of aggravated felonies during the pendency of their exclusion proceedings. Because petitioners are entitled to discretionary release by INS officials, however, the structural bias arguments raised in those cases are equally applicable here.

risk of erroneous deprivation of a petitioner's liberty interest is too great to deny him or her anything less than the full procedural protections available under the Constitution.

## CONCLUSION

In the orders that follow, we individually apply the due process framework in the lead cases to determine whether continued detention violates the petitioner's right to substantive due process. The Court shall provide for expedited review of the remaining petitions that have been stayed pursuant to the April 22nd and June 29th orders. To that end, the government is directed to file a status report and recommendation in each of the stayed cases *within twenty (20) days of entry of this order.* These reports shall evaluate each petitioner's situation in light of the above framework. Counsel for each petitioner may file a response in the respective case *within ten (10) days thereafter.* Each judge shall then consider the petitions pending before him or her according to the above framework and in light of the arguments provided by the parties in the status report and the response thereto.