Sivilay **SENGCHANH**, Petitioner,

v.

Sheriff Jack **LANIER**, Colquitt County Jail Administrator, and Thomas P. Fischer, District Director, Immigration and Naturalization Service, Respondents.

No. Civ.A. 197CV3204WBH.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 28, 2000.

Sivilay Sengchanh, Moultrie, GA, pro se.

Charles H. Kuck, Schwartz Kuck & Associates, Atlanta, GA, for Sivilay Sengchanh, petitioner.

Lori M. Beranek, Office of United States Attorney, Northern District of Georgia, Atlanta, GA, for Thomas P. Fisher, District Director, United States Immigration and Naturalization Service, respondent.

## ORDER

HUNT, District Judge.

Petitioner Sivilay Sengchanh petitions the Court for a writ of habeas corpus [1] on the grounds that his prolonged detention pending deportation violates his substantive and procedural due process rights under the Fifth Amendment and his Eighth Amendment right to be free from cruel and unusual punishment. The Magistrate Judge assigned this case recommends that the writ be denied and the case dismissed. Before the Court is the Magistrate Judge's Report and Recommendation and Sengchanh's objections thereon.

## I. BACKGROUND

Sengchanh became a legal resident of the United States in 1984, three years after his immigration to this country from Laos. On September 23, 1993, he was convicted under South Carolina law of assault with intent to kill, possession of a stolen vehicle, and a firearm violation. While incarcerated, Sengchanh was found deportable by an immigration judge. Sengchanh did not appeal that decision. On August 2, 1996, after completing his sentence, Sengchanh was released into INS custody and was transferred to Colquitt County Jail in Moultrie, Georgia. Over three years have elapsed since he completed his sentence and Sengchanh still remains in custody. INS has attempted to deport Sengchanh to either Thailand or Laos People's Democratic Republic, but because neither country has a treaty allowing repatriation no permission was granted or presumably will be granted in the near future.

On February 12, 1999, the Magistrate Judge issued her first Report and Recommendation on the habeas petition, recommending that the petition be dismissed on the grounds that the court lacked jurisdiction. While the government agreed with the recommended dismissal, it filed a timely motion for reconsideration arguing that the court in fact had jurisdiction of the matter and that dismissal should instead

be on the merits. The Magistrate Judge granted the motion to reconsider, appointed Sengchanh counsel, and invited the parties to submit supplemental briefs. On October 4, 1999, the Magistrate Judge issued the Report and Recommendation currently before this Court, in which she recommends denying the habeas petition on the merits.

## II. DISCUSSION

If no objections are filed to the Report and Recommendation, it is reviewed for plain error only. *United States v. Slay,* 714 F.2d 1093, 1095 (11th Cir. 1983), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984). If, as here, objections are filed the Court must conduct a *de novo* review. *Nettles v. Wainwright,* 677 F.2d 404, 409 (Former 5th Cir. Unit B 1982). In her Report and Recommendation, the Magistrate Judge recommends that the Court find that it has jurisdiction over Sengchanh's petition. She also recommends that the Court dismiss the petition on the grounds that no constitutional rights are implicated in Sengchanh's detention because he forfeited his substantive due process right upon the administrative law judge's issuance of the final deportation order and because detention pending deportation is not punishment. Petitioner objects, arguing that he is entitled to full substantive due process protection and that, at the very least, discovery should be permitted to allow petitioner to show that INS's periodic denial of Sengchanh's release is arbitrary.

Regardless of the fact that neither party challenges the Court's exercise of jurisdiction, given Congress' recent activity in the area of a habeas petitions, it is incumbent upon the Court to determine whether Congress has wrested court review of this type of case. For the reasons cited by the Magistrate Judge, the Court finds that it has subject matter jurisdiction of the instant petition and, accordingly, adopts that section of the Report and Recommendation pertaining to jurisdiction.

*Cruel and Unusual Punishment*

The Eighth Amendment prohibits cruel and unusual punishment. Because it is not implicated absent punishment, when a petitioner's detention is incidental to a legitimate purpose other than punishment, an Eighth Amendment challenge must fail. *See Adras v. Nelson,* 917 F.2d 1552, 1559 (11th Cir.1990); *Gisbert v. United States Attorney General,* 988 F.2d 1437, 1441 (5th Cir.1993). Although Sengchanh may be hard pressed to discern when his punishment ended and non-penal detention began, the Court agrees with those cases holding that pre-deportation detention is not punishment because it is incidental to the government's power to control its borders. *See, e.g., Vo v. Greene,* 63 F.Supp.2d 1278, 1284–85 (D.Colo.1999); *Tran v. Caplinger,* 847 F.Supp. 469, 476 (W.D.La.1993); *but see Ngo v. I.N.S.,* 192 F.3d 390, 397–98 (3d Cir.1999) (noting that it is "unrealistic to believe that these INS detainees are not actually being 'punished' in some sense for their past conduct"). Accordingly, the Eighth Amendment is not implicated in this case and cannot provide the relief Sengchanh seeks.

*Due Process*

Turning now to the question of whether Sengchanh's prolonged detention constitutionally offends his liberty interest, the Court agrees that the crucial question, and one of first impression in this circuit, is whether a legal resident subject to a final order of deportation enjoys greater substantive due process rights than does an alien who never resided legally within this country. To get to that question, however, a brief discussion of the statutory and regulatory scheme behind the deportation process is warranted. The words "excludable" and "deportable" are terms of art. An excludable alien is one who has never resided legally in the United States and to whom the government will not permit legal entry. A deportable alien, on the

other hand, is a former United States resident to whom the government had granted legal status, but whose residency status an immigration law judge revoked. *See Landon v. Plasencia,* 459 U.S. 21, 32–33, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982). After an alien is ordered deported, whether his prior status was one of legal residency or not, the law provides for mandatory detention of up to ninety days, INA § 236(c), 8 U.S.C. § 1226(c) (1999). If deportation is not possible within that time, the Attorney General has the discretion to further detain those aliens with criminal backgrounds whom she determines "to be a risk to the community or unlikely to comply with the order of removal." *Id.* at § 1231(a)(6). If she does release a detained alien, he or she will be subject to supervision.[1] *Id.* at § 1231(a)(3). In seeking release, the burden is on the detainee to show by clear and convincing evidence that he or she poses neither a safety or flight risk.[2] 8 C.F.R. § 241.1. However, the decision whether to release a detainee remains firmly within the Attorney General's discretion. *Id.* Where the Attorney General decides to detain an alien beyond ninety days, guidelines dictate that the decision must be reviewed every six months to determine whether changed circumstances warrant release.[3] Memorandum from Michael A. Pearson, Executive Associate Commissioner Office of Field Communications. August 6, 1999. The reviews alternate between a reappraisal of petitioner's file only and an in-person interview, where petitioner may be represented by counsel and present evidence supporting release. *Id.* Thus, the guidelines guarantee each detainee one annual in-person review to revisit the issue of the detainee's likely danger to the community or flight risk. Any decision stemming from the in-person interview will be final only after upstream review at INS headquarters. Where the INS decides to continue detention, it must provide the alien with written notice delineating the reasons for denial. *Id.* A denial of release is not appealable to a judicial tribunal, but may be appealed to the Board of Immigration Appeals. 8 C.F.R. § 236.1(d)(3).

■ The law is well established that prior to the rendering of a final order of removal, deportable aliens enjoy greater constitutional procedural due process rights than do aliens who are first seeking entry to this country. *See Landon,* 459 U.S. at 32, 103 S.Ct. at 329 (reasoning that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly," thereby entitling that person to a fair hearing when threatened with deportation). However, because the Constitution affords due process to "persons" and not simply to residents, excludable aliens are not without due process rights. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896) ("persons within the territory of the United States . . . and . . . even aliens

---

1. Supervision includes periodic appearances before an immigration officer, submission if so directed to a medical or psychiatric examination, and obeying written restrictions on conduct and activities. 8 U.S.C. § 1231(a)(3).

2. In determining whether the detainee has met his burden, the Attorney General may consider,

 (1) The nature and seriousness of the alien's criminal convictions;
 (2) Other criminal history;
 (3) Sentence(s) imposed and time actually served;
 (4) History of failures to appear for court (defaults);

(5) Probation history;
(6) Disciplinary problems while incarcerated;
(7) Evidence of rehabilitative effort or recidivism;
(8) Equities in the United States; and
(9) Prior immigration violations and history.
 8 C.F.R. § 241.4

3. The Attorney General has delegated release decisions to the District Director for each district. The District Director in turn is authorized to delegate custody decisions to the Assistant District Director or the Deputy Assistant Director.

... [may not] ... be deprived of life, liberty or property without due process of law"); *Plyler v. Doe,* 457 U.S. 202, 211–12, 102 S.Ct. 2382, 2391–92, 72 L.Ed.2d 786 (1982) (the Fifth, Sixth, and Fourteenth Amendments apply to all persons within the United States, including excludable aliens). Nonetheless, because excludable aliens lack the ties that come with long-term, legitimate residency within the United States, their procedural due process rights are almost completely eclipsed by the government's power over immigration. *See Landon,* 459 U.S. at 32, 103 S.Ct. at 329 (noting that an excludable alien "has no constitutional rights regarding his application"); *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953) (unadmitted aliens have only such due process rights as provided by law); *Fernandez–Roque v. Smith,* 734 F.2d 576 (11th Cir.1984) (holding that "excludable aliens cannot challenge either admission or parole decisions under a claim of constitutional right") (quoting *Jean v. Nelson,* 727 F.2d 957, 972 (11th Cir.1984) (en banc), *aff'd* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985)); *Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1449–51 (9th Cir.), *cert. denied,* 516 U.S. 976, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995) (finding that an excludable alien has "no constitutional right to be paroled into the United States, even if the only alternative is prolonged detention").

■ The current state of the law, then, holds that prior to a final deportation order, deportable aliens possess greater procedural due process rights than do excludable aliens, but that no person, regardless of immigration status, is completely devoid of these rights. These greater rights place deportable aliens on a footing more like that enjoyed by citizens.[4] The question is whether these greater rights apply to substantive due process as well as procedural due process and whether they continue after a resident alien is declared to be deportable. The vast majority of district court cases having examined these issues find that even under a final order, a deportable alien is entitled to greater substantive due process protection because of the ties he or she has forged with the United States. For example, in *Phan v. Reno,* 56 F.Supp.2d 1149 (W.D.Wash.1999), the district judges of the Western District of Washington, sitting *en banc,* followed the Supreme Court's reasoning in *Landon* that a deportable alien was entitled to greater procedural due process because of the significant ties this country that long-term legal residency creates. The *Phan* court rejected the notion that a final deportation order alone strips a deportable alien of those ties in the context of substantive due process analysis. *Id.* at 1153. Instead, that court found that any constraint on the alien's liberty must be viewed with heightened scrutiny. *Id.* at 1155. The court then set forth the framework under which to consider the deportable alien's liberty interest in relation to the government's interests in removing deportable aliens, preventing their flight prior or to removal, and protecting the public from danger:

> [t]he critical inquiry, therefore, is whether an alien's detention is excessive in relation to these government interests. In making this determination, we must necessarily balance the likelihood that the government will be able to effectuate deportation, against the dangerousness of a petitioner and the likelihood that he will abscond if released. In so doing, it becomes clear that as the probability that the government can actually deport an alien decreases, the government's interest in detaining that alien becomes less compelling and the invasion into the alien's liberty more severe. Dangerousness and flight risk are thus permissible considerations and may, in certain situations, warrant continued detention, but only if there is a realistic chance that an

---

4. Nonetheless, because they are not citizens, resident aliens may be properly subject to restrictions otherwise intolerable if applied to a citizen. *See Cabell v. Chavez–Salido,* 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982).

alien will be deported. Detention by the INS can be lawful only in aid of deportation. Thus, it is 'excessive' to detain an alien indefinitely if deportation will never occur.

*Id.* at 1156. Likewise, in *Hermanowski v. Farquharson,* 39 F.Supp.2d 148, 156 (D.R.I.1999) the court held that post-deportation order detention cannot be excessive, a determination of which requires an *ad hoc* factual analysis of factors including petitioner's length of post-deportation order detention, the likelihood of deportation, the potential length of future detention, the likelihood of flight, and the danger to the community posed by the petitioner if released. *See also, Vo,* 63 F.Supp.2d at 1278 (holding that extended detention of deportable aliens must serve compelling governmental interest because legal resident's ties to country establish "rights [that cannot] vanish by the legal expedient of a final order of deportation."); *Pesic v. Perryman,* 1999 WL 639194 at *9 (N.D.Ill. Aug.17, 1999) (recognizing that substantive due process claim is cognizable and relief appropriate if petitioner's detention is "excessive", the court accordingly denied government's motion to dismiss as premature where no discovery had been conducted).

However, *Zadvydas v. Underdown,* 185 F.3d 279 (5th Cir.1999), the only circuit court decision to address the extent of a deportable alien's substantive due process rights, is at odds with those cases cited above. In *Zadvydas,* the court found that once the final deportation order issues, any distinction between the two groups evaporates and deportable aliens are accorded no more substantive due process than are excludable aliens. *Id.* at 283. The court recognized, however, that deportable aliens enjoy greater procedural due process prior to the final deportation order. But it attributed that difference to the "entry fiction," under which a non-legal alien, even one physically present for many years in this county, stands at the border, and is seeking only the privilege of entry without asserting a right. *Id.* at 295. The court reasoned that when the interests of deportable and excludable aliens "conflict with the government's sovereignty interests, ... their rights are constrained accordingly and to the same extent." *Id.* at 296.

██ In discussing those district court opinions that distinguish a deportable alien's greater substantive due process rights, the *Zadvydas* court noted that those cases rest on *Landon,* which, despite its broad language regarding a deportable alien's due process rights, was limited to a procedural due process challenge. Thus, *Zadvydas* draws a distinction between procedural and substantive rights. However, in cases such as *Landon, Jean,* and *Barrera–Echavarria,* where the entry fiction is used to explain why less procedural due process is accorded excludable aliens, the starting premise is that process is generally afforded all persons. Nonetheless, because the excludable alien stands outside the borders and has no ties with this country, he or she is entitled to less process. Thus, the "entry fiction" upon which *Zadvydas* relies is an *exception* to the principle that aliens, as persons, possess cognizable constitutional rights under the Fifth Amendment. Accordingly, when the *Landon* Court announced that deportable aliens possess cognizable due process rights, it stated the rule. This Court finds no authority to narrow that rule by carving out an exception for substantive due process. While a deportable alien does not necessarily possess constitutional rights to the same extent as citizens, deprivation of a deportable alien's liberty interest right cannot be excessive in light of the governmental interests at stake.

Even the *Zadvydas* court recognized that at some point deprivation of a deportable alien's liberty can become so excessive as to constitute a substantive due process violation. For instance, the court noted that the alien, who was fifty years old at the time the circuit court addressed his case, was approaching the point at which "age alone would likely weigh against an INS finding of continued danger to the community or flight risk." *Zadvydas,* 185

F.3d at 291 n. 12. And, importantly, the court suggested that should the alien's detention be shown to be permanent, a different outcome might be warranted. However, because deportation to Lithuania, Germany, and Russia might prove feasible, the court could not consider a substantive due process claim until the alien showed that "deportation is impossible, not merely problematical, difficult, and distant." *Id.* at 294. The court held. therefore, that the government may detain an alien it considers either a danger to the community or a flight risk "while good faith efforts to effectuate the alien's deportation continue." *Id.* at 297. Thus, the court made a factual finding that deportation was not completely foreclosed.

 The Court agrees with prior cases, including *Zadvydas*, that find that a deportable alien's detention cannot be excessive. It also agrees with those cases that hold that such a determination requires a fact specific analysis, including consideration of the length of the deportable alien's likely detention, the likelihood of deportation, the potential length of future detention, the likelihood of flight, and the danger to the community posed by the petitioner if he or she is released. Sengchanh has been held for over three years under his status as a deportable alien. Without deciding when a given detention is of such duration to raise substantive due process concerns, the Court finds that three years passes any such threshold. Accordingly, the Court hereby REMANDS this case to the District Director, who is hereby directed to render a determination on or before JULY 15, 2000 as to whether petitioner should remain detained or be released on appropriate bond based on the factors the court articulated above.[5]

---

5. This implies that a brief discovery period be permitted so that the petitioner might mar- shal facts specific to his case.