Phong DOAN, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 99–1420 JM.

United States District Court, S.D. California.

Jan. 6, 2000.

Todd Burns, Federal Defenders of San Diego, Inc., San Diego, CA, for petitioner.

Samuel W. Bettwy, Special Assistant U.S. Attorney, Office of the United States Attorney, San Diego, CA, for respondent.

## REVISED ORDER DENYING PETITION FOR HABEAS CORPUS[1]

MILLER, District Judge.

Petitioner Phong Doan, who is being indefinitely detained by the Immigration and Naturalization Service ("INS") pending his eventual repatriation to the Socialist Republic of Vietnam ("SRV"), has filed a Petition for Writ of Habeas Corpus ("Petition") in which he challenges the constitutionality of his continued detention. For the reasons set forth below, the petition is denied and the action dismissed.

### BACKGROUND

Petitioner, Phong Doan, has been in detention awaiting deportation since October 28, 1998. On July 9, 1999 Petitioner filed an application for writ of habeas corpus pursuant to 28 U.S.C. § 1441, contending that his indefinite detention is in violation of his due process rights guaranteed by the Fifth Amendment.

Petitioner is a native of Vietnam who immigrated to the United States in 1975; and in 1978 his immigration status was adjusted to that of a lawful permanent resident. Petitioner has a lengthy criminal record which includes convictions for felony assault; felon in possession of a firearm; felony conspiracy to commit robbery; misdemeanor conviction for leaving county jail without authorization; and misdemeanor vandalism. Petitioner has spent the better part of the past decade in state confinement. After completion of the sentence he received on May 25, 1994 for attempted robbery, conspiracy to commit robbery and possession of a firearm, on September 24, 1998, the Immigration and Naturalization Service ("INS") placed Petitioner in removal proceedings and determined that he should be detained without bond.

On October 28, 1998 the immigration judge ordered Petitioner removed from the United States to Vietnam. Petitioner appealed to the Board of Immigration Appeals ("BIA") and, effective April 13, 1999, Petitioner withdrew the appeal. In February 1999, the INS conducted a further custody review at Petitioner's request and determined that he continued to present both a danger to the community and a flight risk.

On July 15, 1999, the court ordered the INS to show cause why Petitioner had not been deported to Vietnam. To assist Petitioner in prosecuting this habeas petition, on September 10, 1999, the court appointed counsel to represent him.

### DISCUSSION

A. *Exhaustion of Administrative Remedies*[2]

■ As an initial matter, the government appears to contend that the court lacks jurisdiction to entertain the Petition because Petitioner failed to exhaust his administrative remedies. While the Immigration and Naturalization Act ("INA") does not contain a statutory provision requiring exhaustion of administrative remedies, the court may apply the doctrine where "sound judicial discretion" is advisable. *McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). While administrative procedures are available to review discretionary determinations by the Attorney General, such as whether Petitioner presents a flight risk or a danger to the community, the issues raised in the Petition go beyond the scope

---

1. This revised order is issued to correct several clerical errors in this court's original order entered on January 4, 2000.

2. The government contends that the court lacks jurisdiction to entertain Petitioner's constitutional challenges. This court has consistently held that the court has limited jurisdiction to review certain constitutional issues, like those presented here, under 28 U.S.C. § 2241. *See Magana–Pizano v. INS,* 200 F.3d 603 (9th Cir.); *Goncalves v. Reno,* 144 F.3d 110, 119 (1st Cir.1998). *cert. denied,* —— U.S. ——, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999); *Velasquez v. Reno,* 37 F.Supp.2d 663 (D.N.J. 1999); *Tam v. INS,* 14 F.Supp.2d 1184, 1187–89 (E.D.Cal.1998).

of available administrative review. Petitioner contends that his continued detention is unlawful and in violation of his Fifth Amendment rights. Because no administrative proceeding is available to determine the extent of Petitioner's liberty interests under the Fifth Amendment, the exhaustion requirements do not bar the present Petition. *See Id; Phan v. Reno,* 56 F.Supp.2d 1149, 1153 (W.D.Wash.1999).

## B.  Basis for Petitioner's Detention

Pursuant to 8 U.S.C. § 1226(c)(1), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IRRIRA"), the Attorney General is mandated to take into custody any alien who is deportable by virtue of having committed one of the wide variety of offenses as set forth in 8 U.S.C. § 1227(a)(2)(A) – (D).  Although the INS is mandated to remove deportable aliens within 90 days, under 8 U.S.C. § 1231(a)(6) the INS can continue to detain aliens such as Petitioner who have been ordered deported but who have not been removed within the normal 90 day removal period.

If the alien is not removed within the 90 day removal period, "the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." 8 U.S.C. 1231(a)(6).  The regulations provide that the detainee may be released from physical detention upon demonstrating "by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk...." 8 C.F.R. § 241.4(a).  In reaching this determination, the INS district director is to take into account the following factors: (1) the nature and seriousness of the alien's criminal convictions; (2) the sentences imposed and time actually served; (3) the detainee's history of failing to appear in court; (4) probation history; (5) disciplinary problems while incarcerated; (6) evidence of rehabilitative effort or recidivism; (7) the equities in the United States; and (8) prior immigration violations and history. *Id.* Here, in February 1999 the Attorney General determined that Petitioner poses a danger to the community based upon a review of pertinent factors, including his lengthy criminal history.

## C.  Legal Standards Governing Indefinite Detainees

The issues raised by the detention of "indefinite detainees" require the court to analyze and reconcile two competing and legitimate interests.  On the one hand, " '[t]he exclusion of aliens is a fundamental act of national sovereignty' that 'stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.' " *Zadvydas v. Underdown,* 185 F.3d 279, 288 (5th Cir. 1999) (quoting *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950)).  Not only does the Constitution provide Congress with "plenary power over immigration matters," *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 201, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993), but the power to exclude or deport aliens is "a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (citations omitted). Stated another way, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.  Such matters are so exclusively entrusted to the political branches as to be largely immune from judicial inquiry or interference." *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953).

On the other hand, the Fifth Amendment to the United States Constitution protects the basic and fundamental right to ensure that no person will be deprived of life, liberty or property without due process of the law.  U.S. Const. Amend. V. The protections of the Fifth Amendment extend to all "persons," in-

cluding deportable aliens, within the borders of the United States. *See Landon v. Plasencia,* 459 U.S. 21, 31–32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). "Even one whose presence in this country is unlawful, involuntarily, or transitory is entitled to that constitutional [Fifth Amendment] protection." *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).

In reconciling these apparently conflicting interests, courts generally apply one of two different legal standards to determine the extent of an alien's due process rights.[3] Because the legal standards define the extent of Petitioner's Fifth Amendment rights, each is discussed below.

### 1. The Fundamental Rights Approach

██ In the first instance, Petitioner contends that his indefinite detention violates his fundamental liberty interests under the Fifth Amendment, *i.e.,* that he has a substantive due process right to be free from the detention under which he now finds himself. Where a fundamental liberty right is at issue, the government may only infringe upon that right if the legislation is narrowly tailored to serve a compelling state interest. *See Reno v. Flores,* 507 U.S. 292, 301–02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). If such a fundamental right is not implicated, courts will still scrutinize the governmental action at issue, although courts will only require "a reasonable fit between governmental purpose . . . and the means chosen to advance that purpose." *Id.* at 305, 113 S.Ct. 1439.

The substantive due process analysis has two primary features:

First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in the Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacri-

ficed. Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial "guideposts for responsible decision making," that direct and restrain our exposition of the Due Process Clause.

*Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citations omitted).

██ Neither of the two features of the substantive due process analysis supports a finding that a resident alien who is ordered deported as an aggravated felon has a fundamental liberty interest in being released from detention pending his or her eventual deportation. Indeed, the history, practices, and traditions of our nation's immigration policies consistently bear witness to judicial deference to congressional power over immigration matters. Further, a study of the history, practices, and traditions does not disclose the existence of any fundamental liberty interest, as asserted by Petitioner, to be free from detention pending deportation. In 1896 the Supreme Court articulated the extent of Congress' plenary powers over immigration:

We regard it as settled by our previous decisions that the United States can, as a matter of public policy, by congressional enactment forbid aliens or classes of aliens from coming within their borders, and expel aliens or classes of aliens from the territory. . . . No limits can be put by the courts upon the power of congress to protect, by summary methods, the country from the advent of aliens whose [ ] habits render them undesirable as citizens, or to expel such if they have already found their way into our land, and unlawfully remain therein.

---

**3.** As emphasized by the parties, neither the Ninth Circuit nor the Supreme Court has addressed the issue of whether an indefinitely detained resident aliens possesses a funda-

mental liberty interest in being free from detention when his country of citizenship will not accept the individual's repatriation.

*Wong Wing v. United States,* 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed. 140 (1896). Similarly, "the deportation of an alien who is found to be here in violation of law is not a deprivation of liberty without due process of law." *United States ex rel. Turner v. Williams,* 194 U.S. 279, 290, 24 S.Ct. 719, 48 L.Ed. 979 (1904). The history of our immigration policies also reveals that prior to the enactment of the Immigration Act of 1907, Sec. 20, 34 Stat. 904, 905, a detained alien did not even have the right to seek a bond and was detained pending the ultimate resolution of the deportation proceedings. *See United States ex rel. Zapp v. District Director Of Immigration & Naturalization,* 120 F.2d 762, 765 (2nd Cir.1941); *Ng Fung Ho v. White,* 259 U.S. 276, 280, 42 S.Ct. 492, 66 L.Ed. 938 (1922) ("Congress has power to order at any time the deportation of aliens whose presence in the country it deems hurtful, and may do so by appropriate executive proceedings.").

■ In 1953, the Supreme Court again reaffirmed the plenary powers of Congress over immigration by finding that the indefinite detention of aliens does not violate the Fifth Amendment. *See Mezei,* 345 U.S. at 212, 73 S.Ct. 625. In *Mezei,* the Attorney General indefinitely detained a long term 25 year resident alien when he attempted to reenter the United States because he posed a security threat. Mezei was a stateless person and no other nation would accept him into their country. The Supreme Court recognized that the power to expel or exclude aliens is a "fundamental sovereign attribute" and concluded that no constitutional violation had occurred while emphasizing that an individual's "right to enter the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate." *Id.* at 216, 73 S.Ct. 625. While *Mezei* involved an excludable alien, the power to detain and expel either excludable or deportable aliens is a fundamental attribute of sovereignty: the "right of a nation to expel or deport foreigners who have not been naturalized ... is as absolute and unqualified, as the right to prohibit and prevent their entrance into

the country." *Fong Yue Ting v. United States,* 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893).

Further supporting a finding that indefinite detainees do not possess a fundamental liberty interest are the numerous authorities holding that the indefinite detention of Mariel Cubans does not violate any fundamental liberty interest. *See Guzman v. Tippy,* 130 F.3d 64, 65 (2nd Cir.1997); *Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1445 (9th Cir.1995) (excludable aliens do not have a constitutional right to be free from detention, even for an extended period of time); *Gisbert v. U.S. Attorney General,* 988 F.2d 1437, 1446 (5th Cir.) *amended,* 997 F.2d 1122 (5th Cir.1993); *Fernandez–Roque v. Smith,* 734 F.2d 576, 580 n. 6 (11th Cir. 1984); *Palma v. Verdeyen,* 676 F.2d 100, 103 (4th Cir.1982); *but see Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382 (10th Cir.1981) (indefinite detention not a permissible alternative to exclusion).

In sum, a review of pertinent authorities indicates a deeply rooted tradition which recognizes the limited rights of aliens and the plenary powers of Congress and the Executive branches of government to regulate and control immigration. Our legal traditions, history and actual practices support a finding that deportable indefinite detainees do not have a fundamental right to liberty. The authorities reveal that there is no fundamental liberty interest for a deportable alien to be free from detention that is "deeply rooted in the nation's history," and "implicit in the concept of ordered liberty." *Washington,* 521 U.S. at 720, 117 S.Ct. 2258.

Petitioner raises several arguments in support of what he believes is the fundamental right of an indefinite detainee to be released into society when his country of citizenship refuses to repatriate him. These arguments are not persuasive. First, Petitioner contends that his detention cannot serve as criminal punishment without violating the Fifth Amendment's double jeopardy clause or his due process

rights. In essence, Petitioner contends that his detention is constitutional only when the detention is limited as to time, is not punitive in effect, and promotes legitimate governmental interests. *See Addington v. Texas,* 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ("the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence."). As asserted by Petitioner, the substantive due process analysis includes the determination of whether the detention is imposed for the purpose of punishment or whether the detention is incidental to another legitimate purpose. Whether the legislation was intended to punish indefinite detainees turns on "whether an alternative purpose to which [the detention] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Schall v. Martin,* 467 U.S. 253, 269, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). "Thus, if a particular condition or restriction of ... detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Bell v. Wolfish,* 441 U.S. 520, 538, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

■ With respect to Petitioner's argument that his continued detention constitutes punishment, as has been articulated by the Supreme Court, "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." *United States v. Salerno,* 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Petitioner is being detained pursuant to 8 U.S.C. 1231(a)(6) and 8 C.F.R. § 241.4(a) and the Attorney General's determination that Petitioner presents a danger to the community and a flight risk.[4] The government has a substantial, if not compelling, interest in safeguarding the community, *see Salerno,* 481 U.S. at 749, 107 S.Ct. 2095, and insuring that aggravated felons subject to a final deportation order will not abscond. *See Bell,* 441 U.S. at 538, 99 S.Ct. 1861. Moreover, "[i]t is well settled that deportation, while it may be burdensome and severe for the alien, is not a punishment." *Mahler v. Eby,* 264 U.S. 32, 39, 44 S.Ct. 283, 68 L.Ed. 549 (1924). The Constitution provides that Congress and the Executive branches of government bear the responsibility of regulating the relationship between aliens and the United States. *See Reno v. Flores,* 507 U.S. 292, 300, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). Clearly, it is within the plenary powers of Congress, and a rational exercise of legislative power, to mandate the detention of aggravated felons who by their conduct have forfeited the legal right (and privilege) to remain in the country and continue to present a danger to the community or a flight risk. *See Fong Yue Ting v. United States,* 149 U.S. 698, 730, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). As such, the continued detention of Petitioner, in light of the Attorney General's determination that he continues to represent a threat to the community and a flight risk, does not implicate a fundamental right on the asserted rationale that Petitioner's detention constitutes punishment.

Next, Petitioner contends that this court should follow the reasoning of *Phan v. Reno,* 56 F.Supp.2d 1149, wherein the court recognized that resident aliens have a fundamental liberty interests in being free from incarceration. In *Phan,* the district court judges of the Western District of Washington issued a joint order identi-

---

4. The court observes that prior to the enactment of IRRIRA, the Attorney General could not detain aliens for more than six months after a final order of deportation. *See Castillo–Gradis v. Turnage,* 752 F.Supp. 937, 941 (S.D.Cal.1990). However, prior to enactment of the indefinite detention provisions of IRRI-RA, approximately 90% of persons in Petitioner's situation absconded when released on bail. *See* 62 Fed.Reg. 10,312, 10,323 (1997). Thus, one of the legislative purposes behind the indefinite detention provisions of IRRIRA is to prevent aliens, subject to a final order of deportation, from absconding.

fying three governmental interests related to indefinite detainees: "(1) ensuring the removal of aliens ordered deported; (2) preventing flight prior to deportation; and (3) protecting the public from dangerous felons." *Phan*, 56 F.Supp.2d at 1156. Without the benefit of legal authority, the district court judges adopted a Fifth Amendment due process sliding scale whereby

> as the probability that the government can actually deport an alien decreases, the government's interest in detaining that alien becomes less compelling and the invasion into the alien's liberty more severe. Dangerousness and flight risk are thus permissible considerations and may, in certain situation, warrant continued detention, but only if there is a realistic chance that an alien will be deported. Detention by the INS can be lawful only in aid of deportation. Thus, it is "excessive" to detain an alien indefinitely if deportation will never occur.

*Id.* While such an analytical structure is the product of thoughtful consideration of the difficult problem posed by the indefinite detention of alien deportees, such an analysis is predicated upon whether "there is a realistic chance that an alien will be deported," *id*,[5] rather than upon an analysis of those fundamental rights and liberties "deeply rooted in the Nation's history and tradition." *Washington*, 521 U.S. at 720, 117 S.Ct. 2258. The *Phan* court indicates that the focus should be on the status of diplomatic negotiations between the United States and those countries with whom which the United States does not maintain normal diplomatic relations or those countries who are not parties to repatriation agreements. The difficulty with this analytical framework is that it places the court in the position of assessing the adequacy, or desirability, of diplomatic negotiations in order to determine whether an agreement between the parties is objectively "realistic."[6] The Constitution grants to the legislative and executive branches of government the powers to declare and wage war, to conclude peace, to make treaties, and to maintain diplomatic relations with other sovereignties, *see* U.S. Const. art I, § 8; art II, § 2, and not to the judicial branch of government. *See United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 318, 57 S.Ct. 216, 81 L.Ed. 255 (1936). Accordingly, the court's inquiry into the "status" of diplomatic negotiations is severely restricted and mandates judicial deference. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("[F]ederal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do").

Furthermore, while the *Phan* court recognized that Congress has plenary powers over immigration it nevertheless reasoned that "[i]ndefinite detention of aliens ordered deported is not a matter of immigration policy; it is only a means by which the government implements congress' directives." *Phan*, 56 F.Supp.2d at 1156.

---

**5.** The "realistic chance" of deportation is a significant departure from the "possibility of deportation" applied in *Zadvydas*, 185 F.3d at 297, and *Chi Thon Ngo v. Immigration and Naturalization Service*, 192 F.3d 390, 397 (3rd Cir.1999). For example, in *Zadvydas*, the petitioner was stateless but the Fifth Circuit found there was a possibility of deportation because Zadvydas was born to Lithuanian parents who, prior to World War II, lived in a part of the Lithuania that was controlled by the Soviet Union following World War II. The Fifth Circuit reasoned that Zadvydas could possibly apply for Russian citizenship and therefore there was a possibility of deportation. While his repatriation was possible under this scenario, it would not likely have been "realistic" at that point in time because Petitioner appears not to have taken any steps to obtain Russian citizenship. At the very least, Zadvydas faced numerous hurdles before he could realistically obtain Russian citizenship.

**6.** The ordinary meaning of the word "realistic" is defined as "1. Tending to or expressing an awareness of things as they really are <a *realistic* goal for a beginner> 2. Accurately representing what is depicted or described <a *realistic* portrayal of pioneer life>." *Webster's II New College Dictionary* 922 (1995)

The court then supports this statement by stating that "the prevention of flight and the protection of the community pending deportation of aliens who have been convicted of crimes, involve domestic interests rather than international concerns." *Id.*

■ These arguments fail to recognize the constitutional powers delegated to Congress to regulate aliens. "[O]ver no conceivable subject is the legislative power of Congress more complete." *Fiallo,* 430 U.S. at 792, 97 S.Ct. 1473. The detention of alien aggravated felons who are considered to be either a danger to the community or a flight risk are rationally related to Congress's legitimate purpose of expelling such aliens. The detention of deportable aliens pending deportation is inextricably entwined with immigration policy. The simple fact that detention is a means of carrying out the eventual deportation of deportable aliens makes it no less a matter of immigration policy than Congress's determination that aggravated felons are to be deported. Moreover, the detention of aliens significantly implicates international relations in a way not applicable to citizens. Aliens, unlike United States citizens, may claim the protections afforded by numerous international treaties including the Convention on Human Rights and the Vienna Convention on Consular Relation. Thus, it is well within Congress' power to determine when, and under what conditions an aggravated alien felon may be detained or deported. *See Fong Yue Ting,* 149 U.S. at 730, 13 S.Ct. 1016 (the right to expel or deport aliens "is as absolute and unqualified as the right to prohibit and prevent their entrance into the county.").

Finally, not only would a black-letter rule precluding the indefinite detention of deportable aliens, unless there exists a "realistic" opportunity for repatriation, run counter to the Supreme Court's holding in *Mezei,* but it would significantly expand traditional notions of substantive due process. The Supreme Court has cautioned against the expansion of substantive due process concepts "because the guideposts for responsible decision-making in this unchartered area are scarce and open-ended." *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). "Accordingly, the court has directed the 'exercise of utmost care' when a party seeks to break new ground in the area of substantive due process rights." *Tran v. Caplinger,* 847 F.Supp. 469, 474 (W.D.La.1993) (deportable alien does not have a fundamental right to be free of detention pending his deportation after having been convicted of an aggravated felony) (*citing Collins,* 503 U.S. at 125, 112 S.Ct. 1061). Such an expansive view of substantive due process as urged by Petitioner should not be undertaken lightly or in the absence of persuasive judicial or statutory authority.

Finally, Petitioner contends that the more demanding standard of review set forth in *United States v. Salerno,* 481 U.S. 739, 746–47, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) should apply. In *Salerno,* the Supreme court addressed a due process challenge to the Bail Reform Act of 1984. The test used in *Salerno* was twofold: (1) the statute must be regulatory, not punitive; and (2) if the statute is regulatory, it must not "appear excessive" in relation to the purpose behind the statute. *Id.* at 747, 107 S.Ct. 2095. The soundness of applying this more demanding standard of review is suspect. The liberty interests at stake in *Salerno* involved a defendant's ability be free of pre-trial governmental restraint and imprisonment pending criminal prosecution. Here, by contrast, Petitioner seeks post-conviction relief and, significantly, no longer enjoys the presumption of innocence as did the defendant in *Salerno.* Moreover, the Bail Reform Act does not implicate the plenary powers of Congress over immigration matters. The court thus rejects the application of the standard set forth in *Salerno.*

In sum, the court concludes that the indefinite detention of Petitioner does not implicate a fundamental right. Petitioner's substantive due process rights are

simply to be free from arbitrary and capricious governmental conduct.

### 2. The Deferential Standard of Review

Having determined that Petitioner's detention is not subject to heightened scrutiny, the only remaining issue is to define, in pertinent part, the extent of Petitioner's due process rights. The only two circuit courts that have addressed the issue of indefinite detention of deportable aliens have concluded that

> there is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal if (1) there is a possibility of his eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community.

*Chi Thon Ngo v. Immigration and Naturalization Service,* 192 F.3d 390, 397 (3rd Cir.1999); *Zadvydas,* 185 F.3d at 297 ("We hold that the government may [indefinitely] detain a resident alien based on either danger to the community or risk of flight while good faith efforts to effectuate the alien's deportation continue and reasonable parole and periodic review procedures are in place.").

Both *Zadvydas,* 185 F.3d at 294, and *Chi Thon Ngo,* 192 F.3d at 397, followed the reasoning of *Mezei.* In *Zadvydas* the Fifth Circuit analyzed the due process rights of a stateless person with a long criminal history in the United States who had been ordered deported but was being indefinitely detained by the INS. Zadvydas was born in a displaced persons refugee camp in Germany following World War II; and subsequently immigrated with his family to the United States, but he never became a citizen. Zadvydas had been a permanent legal resident for over 33 years before his detention by the INS. The district court released Zadvydas from custody finding that his permanent detention violated his Fifth Amendment liberty interests. The Fifth Circuit reversed finding that a deportable "resident alien may claim no greater rights than an excludable alien in like circumstances." *Zadvydas,* 185 F.3d at 285. The court concluded that the *Mezei* formulation applied equally to excludable and deportable aliens alike reasoning that "courts have long recognized that the governmental power to exclude or expel aliens may restrict aliens' constitutional rights when the two come into direct conflict." *Id.* at 289; *see Fong Yue Ting,* 149 U.S. at 698, 13 S.Ct. 1016 ("The right of a nation to expel or deport foreigners who have not been naturalized ... is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country.").

The constitutional rationale for applying the *Mezei* formulation to both excludable and deportable aliens is rooted in the plenary powers of Congress to control immigration, *see Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (in determining the rights of a resident alien, due process concerns "must weigh heavily in [favor of] control over matters of immigration" because such control is a "sovereign prerogative"), and the notion that deportation is a civil proceedings not subject to the same procedural protections as a criminal trial. *See I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). Furthermore, excludable and deportable aliens share another common trait: neither have the legal right to be physically present in the country.

To summarize, the court finds the reasoning of the Third and Fifth Circuits persuasive. To the extent Petitioner retains substantive due process rights, those substantive rights do not include a fundamental liberty interest. Petitioner's liberty interests are defined by Congress; and as long as there is a rational basis advancing some legitimate government purpose the court cannot substitute its judgment for that of Congress.

### D. Application of the Standard

■ Applying the Fifth Amendment analysis set forth above to the present petition, the court concludes that Petitioner's continued indefinite detention does not

offend the substantive due process provision of the Fifth Amendment. For the above-stated reasons, Petitioner's detention does not implicate a fundamental right, Petitioner's detention is not excessive in relation to the purpose of the statute, and there is a rational relationship between Petitioner's detention and the governmental interest (i.e. Petitioner continues to represent a danger to the community and a flight risk) that the detention seeks to further.

While the government may indefinitely detain Petitioner, that does not mean that Petitioner is afforded no constitutional or statutory protections. At a minimum, Petitioner, as a deportable alien, is entitled to be free from arbitrary and capricious governmental actions or omissions. *See Flores*, 507 U.S. at 305, 113 S.Ct. 1439 (where a fundamental right is not implicated, courts require only "a reasonable fit between governmental purpose ... and the means chosen to advance that purpose."). Although not presently before the court, were there to be no possibility of repatriation under any future circumstances and were Petitioner not afforded the opportunity to demonstrate that he no longer presents a danger to the community or a flight risk, then Petitioner's continued detention could be arbitrary and capricious. Similarly, Petitioner has certain due process rights which include the opportunity to present evidence at a hearing, *see* 8 C.F.R. § 241.4(a), and the right to a meaningful review of the materials submitted to the Attorney General.[7]

At this point in time, Petitioner has not suffered a deprivation of his Fifth Amendment due process rights. The court finds that the government has acted in good faith in its attempts to repatriate Vietnamese nationals to the SRV. As set forth in the July 21, 1999 declaration of James G. Herren, Assistant Legal Adviser for East Asian and Pacific Affairs, the United States and SRV have made significant strides towards establishing normal diplomatic relations. Those strides include the recent establishment of full diplomatic ties with SRV, the opening of the United States Embassy in SRV, and the approval by the State Department of a final repatriation agreement which was to be submitted to the SRV Embassy in Washington D.C. prior to the end of August 1999. Further evidence that a repatriation agreement is possible is the fact that the SRV recently entered into a similar repatriation agreement with Canada. (Herren Decl. ¶ 14). Next, there are adequate and reasonable procedures for Petitioner to obtain parole. Petitioner may obtain parole upon demonstrating that he is neither a danger to the community or a flight risk. *See* 8 C.F.R. § 241.4(a). Here, the Attorney General determined that Petitioner presents a danger to the community and that his continued detention is required to prevent harm to society. Not only does the INS have a duty to periodically review Petitioner's status to determine if continued detention is warranted, but Petitioner may, at any time, come forward with evidence to meet his burden that he is no longer a flight risk or a danger to the community.

Finally, Petitioner contends that he has been denied a meaningful administrative review by the INS. Petitioner argues that, as set forth in *Phan* and other authorities, the INS has generally not provided a meaningful review of the record. While this is an argument which raises abstract procedural due process concerns, Petitioner fails to identify any constitutional shortcomings as applied to him. Petitioner cannot simply state, in conclusory fashion, that the INS procedures are inadequate without coming forward to identify any particular shortcoming in his specific case.

---

7. These are essentially the same rights provided for in *Zadvydas* and *Chi Thon Ngo:*

 there is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal if (1) there is a possibility of his eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community.

 *Chi Thon Ngo,* 192 F.3d at 397.

## CONCLUSION

In conclusion, for the reasons set forth above, the petition for habeas corpus is denied.

**IT IS SO ORDERED.**