**Sombat Map KAY, Petitioner**

v.

**Janet RENO, Attorney General of the United States; Doris Meissner, Commissioner of the Immigration and Naturalization Service; and J. Scott Blackman, District Director, Philadelphia District, Respondents**

Civil Action No. 1:CV–99–0251.

United States District Court,
M.D. Pennsylvania.

April 18, 2000.

As Amended April 19, 2000.

---

James V. Wade, Federal Public Defender, Harrisburg, PA, Helen Morris, Catholic Legal Immigration Network, Inc, Washington, DC, Rebecca H. Feldman, Catholic Legal Immigration Netwwork, Inc., Boston College Immigration & Asylum Project, Newton, MA, Carla Harr, Catholic Legal Immigration Network, Inc., Washington, DC, for Sombat Map Kay.

Williams Michaels, U.S. Dept. of Justice, Civil Division, Michelle Gorden, U.S. Department of Justice, Civil Division, Washington, DC, for Janet Reno, Doris Meissner, J. Scott Blackman.

Gary S. Gilden, Carlisle, PA, Judy Rabinovitz, American Civil Liberties Union, New York City, for Americans Civil Liberties Union Foundation Immigrants' Rights Project.

## MEMORANDUM

RAMBO, District Judge.

On February 16, 1999 Petitioner Sombat Map Kay filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. The parties have briefed the issues, the court has conducted oral argument on the petition, and the petition is ripe for disposition.

### I. *Background* [1]

Petitioner was born in Cambodia on March 3, 1974 and "escaped from Cambodia" with his mother and three siblings in 1979. Petitioner and his family then spent a number of years in the refugee camps on the border of Thailand. On March 14, 1985 Petitioner and his family were legally admitted to the United States as refugees and resettled in Manchester, New Hampshire. On November 13, 1989 Petitioner ·adjusted his status to that of lawful permanent resident, and this status was instated retroactively to his date of admission, March 14, 1985.

At age fifteen, Petitioner moved out of his family residence to Lowell, Massachusetts. Petitioner was arrested for armed robbery when he was seventeen years old. On September 25, 1992 Petitioner was convicted of three counts arising from a single incident: armed assault, armed robbery, and breaking and entering. He was sentenced to four to ten years on these charges. A portion of his sentence was served at a minimum security prison. Petitioner has stipulated to other criminal activity prior to his conviction including: being involved in a gang; smoking marijuana and drinking alcohol; carrying a gun and a knife; robbing or stealing from people on less than ten occasions, possibly with a knife or a gun; and hitting or pushing his girlfriend at least two or three times. In 1992 a restraining order was issued against Petitioner. In 1991 Petitioner was arrested and convicted for intimidation of a witness.

On March 14, 1995 Petitioner was served with an order to show cause by the Immigration and Naturalization Service ("INS"), and an INS detainer was lodged against him. On September 9, 1996 an immigration judge ordered Petitioner deported to Cambodia, pursuant to the Immigration and Nationality Act ("INA") § 241(a)(2)(A)(iii), 8 U.S.C. § 1251(a)(2)(A)(iii),[2] for commission of an aggravated felony. On September 13, 1996 Petitioner filed a notice of appeal with the Board of Immigration Appeals ("BIA"); and on December 3, 1997 Petitioner was taken into INS custody upon his release from state incarceration.

Petitioner has participated in anger management and narcotics and alcoholics anonymous programs while in prison. Petitioner has had two minor, non-violent, disciplinary problems while in prison in-

---

1. The facts are derived from the parties' March 15, 1999 Stipulation of Facts, and are undisputed unless otherwise indicated.

2. This section is now codified at 8 U.S.C. § 1227(a)(2)(A)(iii).

volving non-approved clothing and a banana in his cell.

On April 30, 1998 the BIA dismissed Petitioner's appeal. On July 29, 1998 Petitioner was reviewed for supervised release by the INS pursuant to the Criminal Alien Review Panel program. The review panel found that Petitioner was not credible, that he refused to accept responsibility for his actions, and that he had the potential to be "very dangerous." The panel recommendation was that they were unable to conclude that Petitioner, upon being released from INS custody, would not pose a threat to the community, and the district director concurred.

On September 17, 1999 the district director conducted a custody review of Petitioner. The district director filed a preliminary determination on that date recommending that Petitioner not be released on parole as a result of "the severity of the subject['s] past convictions and the lack of credibility of his statements." (Resps.' Opp. to Pet.'s Br. Addressing *Ngo*, Ex. D at 7.) As of this date, no final determination has been filed. At oral argument, INS counsel stated that another review of Petitioner's detention would not likely be undertaken until a final determination is made on the September 1999 custody review. (Oral Arg. Transcript (hereinafter "N.T.") at 26.)

Petitioner has been in continuous custody since September 1992. The INS has been unable to effect the deportation of Petitioner to Cambodia. In fact, the INS has been unable to convince Cambodia to accept deportees in general. The INS views Petitioner as an alien whose immediate repatriation is impossible or impracticable. As of March 11, 1999, the INS had not requested travel documents for Petitioner from the Cambodian government, and no contrary evidence has been pro-

duced to the court as of the time of this memorandum and order.

Petitioner denies that he committed the crime for which he was convicted. He has admitted that he sometimes has a problem with his temper. He also admits that he does not like or trust the police. However, he testified that the anger management course taught him how to deal with anger and how to cope.

Petitioner filed the instant petition for writ of habeas corpus on February 16, 1999. The parties filed briefing on the petition, as well as supplemental briefing concerning court decisions subsequent to their original briefing. On March 27, 2000 the court conducted oral argument on the legal issues presented in the instant petition.

## II. *Discussion*

The central issue in the case is whether the prolonged detention of Petitioner, a legal resident alien subject to a final order of deportation for committing a serious crime, may be violative of due process when his country of origin refuses to allow his return. This presents a different issue from that encountered in the Third Circuit's recent decision in *Ngo v. Immigration and Naturalization Service,* 192 F.3d 390 (3d Cir.1999), where the petitioner was an excludable, not a deportable alien.[3]

Petitioner is being detained by the INS pursuant to statutory authority. The current statutory framework allows the INS to detain removable aliens, defined to encompass both excludable and deportable aliens, beyond the 90 day "removal period." *See* 8 U.S.C. § 1231(a)(6), INA § 241(a)(6). An accompanying regulation grants the district director, an INS employee, the discretion to release an alien into the community pending removal under certain circumstances:

**3.** The *Ngo* court held that, based upon due process rights, even an excludable alien is entitled to periodic reviews to consider the legitimacy of his prolonged detention. The

court will discuss the *Ngo* decision and the distinction between deportable and excludable aliens in Section II(B), *infra*.

The district director may continue in custody any alien ... removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) of the Act, or who presents a significant risk of noncompliance with the order of removal, beyond the removal period, as necessary, until removal from the United States. If such an alien demonstrates by clear and convincing evidence that the release would not pose a danger to the community or a significant flight risk, the district director may, in the exercise of discretion, order the alien released from custody on such conditions as the district director may prescribe, including bond in an amount sufficient to ensure the alien's appearance for removal.

8 C.F.R. § 241.4. Thus, according to the applicable statutes and regulations, under certain circumstances, the district director has the discretion, but is not required, to release aliens pending removal.

■ The Due Process Clause of the Fifth Amendment states that "[n]o person ... shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. As its protection extends to all "persons" within the borders of the United States, it encompasses deportable aliens such as Petitioner. *See Landon v. Plasencia*, 459 U.S. 21, 32–33, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982); *see also United States v. Balsys*, 524 U.S. 666, 671, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998) (holding that "[r]esident aliens ... are considered 'persons' for purposes of the Fifth Amendment and are entitled to the same protections under the [Self–Incrimination] Clause as citizens" (citing *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953))); *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (holding that "persons within the territory of the United States ... [and] even aliens ... [may not] be deprived of life, liberty or property without due process of law").

Petitioner challenges his continued detention on both substantive and procedural due process grounds. In the first section, the court considers Petitioner's substantive due process claim and finds that his prolonged detention violates his right to liberty.[4] Next, the court discusses its holding in relation to the Third Circuit's decision in *Ngo*. It also examines two recent circuit court decisions which are contrary to the instant holding.

### A. *Substantive Due Process*

■ The substantive component of due process protects against governmental interference with those rights "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 324–25, 58 S.Ct. 149, 82 L.Ed. 288 (1937). This component "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). A court's analysis should begin "with a careful description of the asserted right." *Id.* at 302, 113 S.Ct. 1439.

■ The INS argues that what is at issue for Petitioner is not a right, but "an interest in release into the national community." (N.T. at 34–35.) The court does not agree—what is at issue is a right, and further, it is a right that cannot be construed so narrowly. The government attempts to contort Petitioner's right as being *free to* be at large in the United States, instead of as being *free from* restraint behind bars. This contortion would frame the government, not as confining Petitioner to a cell, but as keeping him separated from the rest of society by a barrier. No matter how the right is couched, the result is the same, Petitioner's liberty is restrained and it is the government that is

---

4. The court need not consider Petitioner's procedural due process claim because only if a restriction on liberty survives substantive due process scrutiny is it necessary to consid- er whether the restriction is implemented in a procedurally fair manner. *See United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

responsible. The government's manipulation of the point of reference cannot change what is actually at issue: Petitioner's fundamental right to be free from incarceration. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).[5]

The INS asserts that rational basis scrutiny should be applied to Petitioner's substantive due process claim; however, the court has demonstrated that Petitioner's fundamental right to liberty is at issue. Any infringement of this right is subject to strict scrutiny, and therefore the infringement must be "narrowly tailored to serve a compelling state interest." *See Reno v. Flores,* 507 U.S. 292, 301–02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Salerno,* 481 U.S. 739, 747, 107 S.Ct. 2095, 95 L.Ed.2d 697. In detention cases, *Salerno* sets forth the appropriate strict scrutiny analysis: first, whether the detention is based upon permissible regulatory purposes, and if so, whether the detention is "excessive in relation to the regulatory purpose Congress sought to achieve." *Id.* at 747–48, 107 S.Ct. 2095.

The court agrees that the purposes of Petitioner's detention as described by the government are legitimate regulatory purposes: (1) executing his removal; (2) preventing his flight prior to deportation; and (3) preventing danger to the community. *See* 8 U.S.C. § 1231(a)(6). The latter two purposes, while permissible, are derived solely from the first. *See Phan v. Reno,* 56 F.Supp.2d 1149, 1155–56 (W.D.Wash. 1999) (en banc panel decision).[6] Nevertheless, the court recognizes that all three of these interests may be compelling.[7]

Additionally, "[t]he government's interest in efficient administration of the immigration laws at the border also is weighty." *Plasencia,* 459 U.S. at 34, 103 S.Ct. 321. However, the court believes that the case at bar presents different factual circum-

---

**5.** An additional right of Petitioner is derivatively violated by the government confining him: "the right to rejoin [his] immediate family, a right that ranks high among the interests of the individual." *Plasencia,* 459 U.S. at 34, 103 S.Ct. 321.

**6.** At the time of the initial filing of this opinion, the court was unaware of the Ninth Circuit's recent ruling in *Ma v. Reno,* 208 F.3d 815 (9th Cir.2000). Therefore, this footnote was added as an amendment to the initial opinion to briefly discuss the circuit court's opinion.

Ma's petition for writ of habeas corpus was one of five designated "lead" cases in the Western District of Washington's panel decision in *Phan,* 56 F.Supp.2d 1149. The Ninth Circuit's ruling in *Ma* affirmed the district court's holding that Ma's petition for writ habeas corpus should be granted. See *Ma v. Immigration and Naturalization Service,* 56 F.Supp.2d 1165 (W.D.Wash. 1999). However, the Ninth Circuit did not decide whether the INS's indefinite detention policy violates the due process guarantees of the Fifth Amendment, but construed the statute authorizing detention, 8 U.S.C. § 1231(a)(6), narrowly so as to disallow indefinite detention. The court stated:

We hold that Congress did not grant the INS authority to detain indefinitely aliens who, like Ma, have entered the United States and cannot be removed to their native land pursuant to a repatriation agreement. To the contrary, we construe the statute as providing the INS with authority to detain aliens only for a reasonable time beyond the statutory removal period. In cases in which an alien has already entered the United States and there is no reasonable likelihood that a foreign government will accept the alien's return in the reasonably foreseeable future, we conclude that the statute does not permit the Attorney General to hold the alien beyond the statutory removal period. Rather, the alien must be released subject to the supervisory authority provided in the statute.

*Ma,* 208 F.3d 815, 821. While the circuit court does not conclude that indefinite detention of deportable aliens is a violation of due process the decision does lend support to this court's instant holding to the extent that it explicitly states that indefinite detention is not authorized.

**7.** Although the court finds that these regulatory purposes are legitimate, the court agrees with the Third Circuit's observation that it is "unrealistic to believe that [ ] INS detainees are not actually being 'punished' in some sense for their past conduct." *Ngo,* 192 F.3d at 398.

stances and different issues. In *Plasencia*, the petitioner was a permanent resident alien who had left the United States for a period of time, and who upon her return was subject, by statute, to an exclusion hearing. She was challenging the due process of the exclusion hearing. In the case at bar, Petitioner is challenging his prolonged detention; he does not seek to challenge his order of deportation or to reinstate his permanent resident alien status. He only seeks to be released from confinement pending his removal. Therefore, to consider Petitioner while in detention to be "at the border," outside the United States, would be a fabrication.

■ The court recognizes that "[t]he right of a nation to expel or deport foreigners ... is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country." *Fong Yue Ting v. United States*, 149 U.S. 698, 707, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). It is also true that "[t]he exclusion of aliens is a fundamental act of national sovereignty" that "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 94 L.Ed. 317 (1950). However, prolonged detention after a final order of deportation is not the same as deportation or even exclusion. Accordingly, the government's interests are not at their maximum level, and the government's power is not plenary. *See Phan*, 56 F.Supp.2d at 1155 (The plenary power doctrine supports judicial deference on substantive immigration matters, but not post-deportation order detention, as indefinite detention of deportable aliens is not a matter of immigration policy. Prevention of flight and protection of the community pending deportation are domestic interests rather than international concerns.)

The strict scrutiny analysis of *Salerno* requires the court to balance the fundamental right of Petitioner to be free from incarceration against the government's compelling interests. This analysis is very difficult in the factual circumstances of the instant action. The government's interests are weighty because Petitioner's crime was serious; as well, the other acts he admitted to doing before his conviction are serious.

There is another important factor to be considered in determining if the detention of Petitioner is excessive in relation to the government interests: the likelihood that the INS will be able to effectuate deportation. *See Phan*, 56 F.Supp.2d at 1156. If deportation can never occur, the government's primary legitimate purpose in detention—executing removal—is nonsensical, and the other derivative purposes cannot support indefinite detention. However, this proposition also applies when the probability of effecting deportation is existent, but low. "[A]s the probability that the government can actually deport an alien decreases, the government's interest in detaining an alien becomes less compelling and the invasion into the alien's liberty more severe." *Id.* Accordingly, the court "must necessarily balance the likelihood that the government will be able to effectuate deportation, against the dangerousness of a petitioner and the likelihood that he will abscond if released." *Id.* The length of time that a petitioner is detained is an important factor in this analysis.

There is substantial support in case law that the duration of detention can affect whether the detention is excessive in relation to the government's legitimate purposes. An example comes from language in the Supreme Court's decision in *Salerno*, the case which described the appropriate strict scrutiny analysis in detention cases. The issue in *Salerno* was the pretrial detention, pursuant to the Bail Reform Act, of certain criminal defendants charged with serious felonies who were found after an adversary hearing to pose a threat to the community which no condition of release could dispel. Although holding that the Bail Reform Act was not

facially invalid under substantive due process, and pretrial detention is permissible, the Court stated: "[w]e intimate no view as to the point at which detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal." *Salerno*, 481 U.S. at 748 n. 4, 107 S.Ct. 2095.

Similarly, in another case considering the Bail Reform Act, the Third Circuit intimated that, even in pretrial detention, length of duration matters:

[A]t some point due process may require a release from pretrial detention ... due process judgments should be made on the facts of individual cases, and should reflect [*inter alia*] factors ... such as the seriousness of the charges, the strength of the government's proof that defendant poses a risk of flight or a danger to the community, [and]... *the length of the detention that has in fact occurred* ... In some cases, the evidence admitted at the initial detention hearing, evaluated against the background of the duration of pretrial incarceration and the causes of that duration, may no longer justify detention.

*United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir.1986) (emphasis added).

Reasoning in another Supreme Court case, *United States v. Witkovich*, 353 U.S. 194, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957), also suggests that length of detention is an important consideration. In *Witkovich*, a case dealing with questioning deportable aliens concerning their availability for deportation, the Court used the principle of constructive avoidance to construe a statute narrowly so as to avoid a due process violation. The Court stated: "This is not *Carlson v. Landon* [,342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952)] , [ ] where the question was whether an alien could be detained during the customarily brief period pending determination of deportability. Contrariwise, ... supervision of the undeportable alien may be a lifetime problem." *Id.* at 201, 77 S.Ct. 779.

The court applies this reasoning—that duration of detention affects whether detention is excessive in relation to government interests—to the case at bar. The court therefore agrees with the recent decision of *Nguyen v. Fasano*, 84 F.Supp.2d 1099 (S.D.Cal.2000), which held: "after some length of time in custody, where deportation is not reasonably foreseeable, a petitioner's liberty surpasses the INS's diminished interest in ensuring deportation, and detention becomes punitive in relation to the INS's regulatory goals." *Id.* at 1113; *accord Hermanowski v. Farquharson*, 39 F.Supp.2d 148, 159 (D.R.I. 1999) (considering *inter alia*, the length of detention to which the petitioner has already been subjected and the potential length of the detention into the future, in deciding whether detention of deportable alien is excessive); *Sengchanh v. Lanier*, 89 F. Supp.2d 1356 (N.D.Ga.2000) (same).

Petitioner has been detained in INS custody since he was released from his criminal incarceration, well over two years ago. His record while serving his sentence and while in INS custody indicates that he has not committed any violent acts that have warranted disciplinary action. Additionally, he has completed narcotics and alcoholics anonymous programs and anger management courses. There does not appear to be any evidence that Petitioner demonstrates an enhanced risk of flight. Petitioner has family in New Hampshire who have represented that they will provide him with a home and other assistance if he is released. Nevertheless, Petitioner was convicted of serious crimes and has admitted to committing other violent crimes before his conviction. Therefore, Petitioner's dangerousness and risk of flight must be balanced against the likelihood that the government will be able to effectuate his deportation.

It appears to be extremely unlikely that Petitioner will be deported in the foreseeable future. At this time, the United States does not have a repatriation agreement with Cambodia. (Stipulation of Fact, ¶¶ 79, 81, 92.) Furthermore, there is no evidence that the INS has requested travel

documents for Petitioner, even though he has been in INS custody for over two years. (*Id.*, ¶ 81.) Because Petitioner's deportation is unlikely, the government only has a slight interest in detaining him to effectuate that deportation.[8] *See Phan v. Smith,* 56 F.Supp.2d 1158, 1159 (W.D.Wash.1999). Balancing the government interests against Petitioner's significant liberty interest in being free from incarceration, the court finds that the prolonged detention is excessive.

The court concludes that Petitioner's continued detention violates his substantive due process rights as a matter of law. Accordingly, the court finds that Petitioner will be released, subject to the supervision of the Attorney General on conditions of release found in 8 C.F.R. § 241.5, unless the INS produces evidence that Petitioner's deportation is likely in the foreseeable future, sufficient to outweigh Petitioner's liberty right.

### B. *Excludable Versus Deportable Aliens*

■ The INS asserts that the court is obliged to follow the Third Circuit's recent ruling in *Ngo*, 192 F.3d 390, and hold that there is no substantive due process violation. Although the Third Circuit amended its decision in *Ngo* to make explicit that the holding only pertains to excludable aliens and not deportable aliens,[9] the INS asserts that the result should be the same, arguing that excludable and deportable aliens have identical due process rights. The court, however, does not agree that excludable aliens and deportable aliens are equal for the purposes of the Due Process Clause of the Fifth Amendment. In fact, several recent district courts have found, in detention contexts, that deportable aliens are entitled to greater substantive due process than excludable aliens. *See Phan*, 56 F.Supp.2d at 1154 (holding that "[p]etitioners are deportable-not excludable-aliens, and this distinction is critical"); *Nguyen*, 84 F.Supp.2d at 1109–10 (holding that deportable aliens have greater substantive due process rights than excludable aliens); *Sengchanh*, 89 F.Supp.2d 1356, 1361 (same); *Pesic v. Perryman*, No.99 C 3792, 1999 WL 639194, at *7 (N.D.Ill. Aug.17, 1999) (same); *Hermanowski*, 39 F.Supp.2d at 157 (same); *Hinojosa–Perez v. Eddy*, 55 F.Supp.2d 1001, 1005 n. 5 (D.Alaska 1999) (same).

These findings are supported by language of Supreme Court decisions. "Once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly." *Plasencia*, 459 U.S. at 32, 103 S.Ct. 321. In another case, the Court explained:

> [O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry, irrespective of its legality. In the latter instance, the Court has recognized additional rights and privileges not extended to those in the former category who are merely "on the threshold of initial entry."

*Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958).

The reason that excludable aliens have historically been accorded less, or even no, due process rights is what has come to be known as the "entry fiction." The Su-

---

**8.** At oral argument on March 27, 2000, the INS represented to the court that Cambodian officials were scheduled to meet with Petitioner the prior Friday, March 24, 2000. However, the court is not certain that this meeting occurred, as the INS lawyer did not have personal knowledge of the meeting and stated, "I do know that it was *supposed* to have taken place on Friday morning in Mr. Kay's case." Neither has the INS offered any evidence to date that this meeting occurred or

that it is likely to lead to Petitioner's deportation. (N.T. at 40.)

**9.** Among other changes that limited the holding to excludable aliens, the Third Circuit added a new footnote which reads: "Our holding is confined to excludable aliens. We express no views on the situation where deportable aliens are involved." *Ngo*, 192 F.3d at 398 n. 7.

preme Court decision of *"Mezei* [10] established what is known as the 'entry fiction' which provides that although aliens seeking admission into the United States may physically be allowed within its border pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into the country." *Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1450 (9th Cir.1995) (en banc) (citations omitted). In *Mezei,* the petitioner had been a lawful resident alien who "without authorization or reentry papers, simply left the United States and remained behind the Iron Curtain for 19 months." *Mezei,* 345 U.S. at 214, 73 S.Ct. 625. When he attempted to reenter the United States he was stopped at the border although he was allowed to disembark from his ship onto Ellis Island, thus entering the United States. By statute, Congress had specified that "such shelter ashore 'shall not be considered a landing' ... [a]nd [the Supreme] Court has long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border." *Id.* at 215, 73 S.Ct. 625 (citations omitted). When seen as stopped at the border, the excludable alien is not asserting any right, but is requesting a privilege to enter. *See Plasencia,* 459 U.S. at 32, 103 S.Ct. 321. As a result, the Due Process Clause affords an excludable alien no procedural protection beyond the procedure explicitly authorized by Congress, *see id.* at 212, 103 S.Ct. 321, nor perhaps any "substantive right to be free from immigration detention." *Barrera,* 44 F.3d at 1450. However, this "entry fiction" has been utilized to extend the circumstances when an excludable alien is afforded less procedural and substantive due process rights than other "persons." *See, e.g., Gisbert v. U.S. Attorney General,* 988 F.2d 1437, 1442 (5th Cir.1993) (holding that indefinite detention of excluded Mariel Cubans does not violate their substantive due process rights because, although excludable aliens have substantive due process rights to be free from "gross physical abuse," they "may legally be denied other due process rights, including the right to be free of detention") (citing *Lynch v. Cannatella,* 810 F.2d 1363 (5th Cir.1987)).[11]

The entry fiction appears to be contributing to a new phenomenon in recent case law, but now it is adversely affecting deportable aliens in addition to excludable aliens. Two recent circuit opinions addressing the same issue as in the instant action have both found that deportable aliens have the same due process rights as excludable aliens, and the courts have upheld their indefinite detention.[12] In *Ho,* the Tenth Circuit relies heavily on *Mezei* in stating that "physical presence alone does not confer heightened constitutional rights on an alien seeking admission to this country," and therefore holding that both excludable and deportable aliens have lower substantive due process rights than citizens. *Id.* at 1058–59. However, the court did not recognize the important distinction that the petitioner in *Mezei* was an excludable alien subject to the "entry fiction" based on the specific facts of his case. Of the two petitioners in *Ho,* one was an excludable alien and the other was a deportable alien. The court explained that "[t]he final removal orders stripped both

---

**10.** *Shaughnessy v. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (holding that detention of alien subject to exclusion did not deprive him of constitutional rights when no other country would admit him).

**11.** Other courts have also recognized, or at least suggested, that excludable aliens may be entitled to less statutory or due process rights than other "persons." *See Plasencia,* 459 U.S. at 32, 103 S.Ct. 321, *supra; Leng May Ma,* 357 U.S. at 187, 78 S.Ct. 1072, *supra; see*

*also Ngo,* 192 F.3d at 398 (holding that "grudging and perfunctory review is not enough to satisfy the due process right to liberty, *even for aliens."*).

**12.** These are the only two circuit courts that have analyzed the issue of the indefinite detention of a deportable alien whose country will not readmit him. *See Ho v. Greene,* 204 F.3d 1045 (10th Cir.2000) and *Zadvydas v. Underdown,* 185 F.3d 279 (5th Cir.1999).

Ho and Nguyen of any heightened constitutional status either may have possessed prior to the entry of the final removal order. Like an alien seeking initial entry, Petitioners have no right to be at large in the United States." *Id.* at 1059. The court also stated that both petitioners "have no greater constitutional rights with respect to their applications for admission than an alien seeking to enter this country for the first time." *Id.*

While relying on the "entry fiction" of *Mezei* which applies to a specific class of aliens who have not yet physically entered the United States and who are subject to exclusion proceedings, *Ho* essentially extends this fiction to all excludable and deportable aliens and declares that they are entitled to lower due process rights. This court finds such reasoning counterintuitive; instead the court agrees with the dissenting opinion in *Ho* which explains:

> Close analysis reveals that the majority's treatment of Petitioners' constitutional claims is supported only by a tenuous foundation of legal fiction stacked upon legal fiction. In order to characterize Petitioners as aliens seeking admission, the majority must first equate the removal order itself with an actual physical exit from the country. Having made that leap, the majority adopt the "entry fiction" applied in admission cases so as to characterize immigrants who are physically present within United States borders pending a determination of admission as never having effected entry into this country and therefore not entitled to due process protection. *See Plasencia,* 459 U.S. at 32–33, 103 S.Ct. 321. Compounding these fictions is the majority's unsupported conclusion that while Petitioners resided in the United States they may have enjoyed some form of "heightened" constitutional status that could be stripped away upon

the issuance of a removal order. Finally, to avoid the constitutional prohibition against imprisonment for purposes other than punishment, the majority employs the fiction that detention is merely an extension of the exclusion proceedings, and therefore within the plenary power of the executive and legislative branches to govern immigration matters.

*Id.* at 1061 (Brorby, dissenting). The court agrees with Judge Brorby that creation of these additional fictions and application of them to reduce a deportable alien's substantive due process rights are in direct conflict with Supreme Court decisions holding that aliens are "persons" guaranteed due process of law by the Fifth and Fourteenth Amendments. *Id.* (citing *Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)).

The court believes that the majority in *Ho* incorrectly placed the burden on the deportable alien to distinguish his due process rights from those lower rights an excludable alien may possess. 204 F.3d at 1059–60. However, it was the majority that extended the "entry fiction" to deportable aliens and accordingly lowered their due process rights without any support.[13]

In *Zadvydas,* the Fifth Circuit, the only other circuit court that has addressed the instant issue, also relied on precedents dealing with excludable aliens in determining that deportable aliens have lower due process rights than other "persons." The court in *Zadvydas* held that "we do not believe that the difference between excludable aliens and resident aliens mandates a radical departure from the reasoning of *Gisbert.*" 185 F.3d at 290. Thus, the Fifth Circuit relied on its earlier decision in *Gisbert* that dealt with excludable aliens and that "relied on the [Supreme] Court's decision in *Mezei.*" *Id.* Therefore, like the Tenth Circuit in *Ho,* the *Zadvydas* court was essentially extending the "entry fiction" to lower the due process rights of deportable aliens.[14] While, the *Zadvydas*

---

13. Considering a similar argument, the *Phan* court held: "No authority supports the government's position that aliens somehow 'assimilate' to excludable status once they have been ordered deported, thereby relinquishing their constitutional rights." 56 F.Supp.2d at 1154.

14. The *Zadvydas* decision stated that it did not rely on the "entry fiction," and aliens do have "some due process," *id.* at 294–95; however,

court acknowledged that aliens have some substantive due process rights, it did not provide guidance on what level of scrutiny was being applied to alleged violations of deportable aliens' due process. However, the court cited its prior decision in *Lynch*, 810 F.2d at 1374–75, for the proposition that "excludable aliens are persons, and thus allowed to bring suit against allegedly brutal government agents since 'we cannot conceive of any national interests that would justify the malicious infliction of cruel treatment.'" [15] This suggests that the Fifth Circuit would apply a less stringent standard than strict scrutiny to violations of both deportable and excludable aliens' fundamental rights.[16]

The Third Circuit's decision in *Ngo*, which the INS asserts that the court should apply to the instant action, deals with an excludable alien and consequently relies on precedents that also concern excludable aliens. *See, e.g.,* 192 F.3d at 396 (stating that "*Mezei* has been much criticized, but has remained a governing precedent and has been applied, with some modifications, in most leading cases"). As has been discussed, *Mezei* created the "entry fiction" for certain excludable aliens; using this precedent to support equal due process rights for deportable and excludable aliens is not sound reasoning. Other cases that *Ngo* relies upon which deal with excludable aliens utilize policy consideration that could apply only to excludable, and not deportable aliens. For example, the

court cited the Eleventh Circuit opinion of *Jean v. Nelson*, 727 F.2d 957, 975 (11th Cir.1984) (en banc), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), for the proposition that if excludable aliens are released into American society, the country will "ultimately result in our losing control over our borders." *Ngo*, 192 F.3d at 394. However, the *Jean* court's next sentence explained: "A foreign leader could eventually compel us to grant physical admission via parole to any aliens he wished by the simple expedient of sending them here and then refusing to take them back." 727 F.2d at 975. While this logic does apply to excludable aliens, it cannot apply to deportable aliens: if a foreign leader did send aliens to the United States, they need not be permitted to become permanent resident aliens subject to deportation proceedings, but would be excludable aliens with lower due process rights who could be indefinitely detained pending exclusion. Therefore, for reasons discussed *supra*, the court does not believe it proper to extend *Ngo* and the precedents dealing with excludable aliens to Petitioner in the instant action.

The court, however, does find that much of the reasoning of the *Ngo* decision lends support to this court's holding. First, *Ngo* holds that even excludable aliens in detention pending removal are entitled to fair consideration of an application for parole pending removal, *see id.* at 399, based upon their substantive due process right to

---

the court's reasoning was predicated on the principle that aliens, excludable and deportable, have less due process rights than other "persons."

**15.** This passage of the *Lynch* opinion also stated, "whatever due process rights excludable aliens may be denied by virtue of their status, they are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials." *Id.* at 1374.

**16.** With regard to the excludable-deportable alien distinction, the *Zadvydas* court stated:
As applied to detention pending removal, any here relevant constitutional distinction

between excludable and resident aliens who have each been properly and finally determined to be removable would necessarily rest on a conclusion that excludable aliens are nonpersons wholly unprotected by the Constitution. However, that conclusion would conflict with our holding in *Lynch* and would require us to conclude that aliens in the position of those in *Gisbert* could be statutorily subjected to the rack and the screw.

*Id.* at 296. However, the court disagrees: the excludable aliens in *Lynch* and *Gisbert* could be afforded less due process rights than citizens, but rights still sufficient to prevent "gross physical abuse." *See Lynch*, 810 F.2d at 1374, *supra*.

liberty. *See id.* at 398.[17] Further, in reaching this conclusion, *Ngo* summarized case law that allowed indefinite detention so long as: (1) there is a possibility of the alien's eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; *and* (3) detention is necessary to prevent a risk of flight or a threat to the community. *See id.* at 397. According to the mandatory first element then, there must be a possibility of the alien's eventual removal. This court does not believe that the Third Circuit meant to infer that any scintilla of a possibility would meet this requirement, but only a reasonable probability—for if any possibility of removal was sufficient, then the requirement would be meaningless because there can be no set of facts where the possibility is nonexistent. Another concept described in *Ngo* that supports this court's finding is that the length of detention was considered. "When detention is prolonged, special care must be exercised so that the confinement does not continue beyond the time when the original justifications for custody are no longer tenable." *Id.* at 398.

### C. *Conditions of Release*

As discussed *supra,* the court does recognize the INS's position that deportable aliens whose country of origin refuse to allow their return may pose a risk of flight. However, regulations have been promulgated that describe detailed conditions of release for aliens. *See* 8 C.F.R. § 241.5. The court finds that, should Petitioner be released into the community, the INS shall see that the conditions of § 241.5 are provided.

### III. *Conclusion*

In accordance with the foregoing, the court finds that Petitioner's petition for writ of habeas corpus should be granted, unless the INS produces evidence within 90 days that demonstrates that Petitioner's

---

17. The *Ngo* decision does not specify, and this court takes no position as to what level of scrutiny an excludable alien, such as at issue in *Ngo,* is entitled based upon substantive due process. The court's holding only applies to the deportable Petitioner at issue and recognizes that his fundamental liberty interest entitles him to heightened scrutiny.

---

removal is likely in the foreseeable future such that Petitioner's liberty right is outweighed. Absent such showing, the INS shall release Petitioner from confinement pursuant to the conditions of 8 C.F.R. § 241.5. An appropriate order will issue.